J. W. CRISFIELD, for Complainant.
JOHN H. DONE, for the Defendants.

---

SARAH E. MITCHELL,
vs.
HENRY S. MITCHELL, ADMR.,
D. B. N. OF JAMES D. MITCHELL. } MARCH TERM, 1852.

[CHANCERY PRACTICE.—CHARGE OF DEBT OR LEGACY UPON REAL ESTATE.]

THOUGH an administrator, when called upon to account in Chancery, may exhibit with his answer and explain not only the accounts passed in the

Orphans' Court, but the vouchers for the credits therein allowed him, yet he cannot be compelled to do so.

Accounts settled in the Orphans' Court are *prima facie* evidence in suits relating to the matters contained in them, and he who disputes their correctness has the *onus* upon him of proving their falsity.

The vouchers are to be regarded as evidence, and need not be filed as part of the pleadings: to require them to be produced and explained in detail in the answer would render Chancery proceedings intolerably expensive and voluminous.

It is sufficient if they are produced before the Auditor when he is about to state the account, and their production then will upon application be enforced.

Where a bill alleges that an administrator has failed to *charge* himself with the hire of certain negroes, and the profits of leasehold property, and prays for a discovery of the full value, and true accounts which he has or ought to have received on account thereof, an exception to the answer upon the ground that it does not give this information will be sustained.

The accounts passed in the Orphans' Court, with the light which the vouchers when produced will throw upon them, will not give the complainant the information called for by this charge of his bill.

Where a bill calls upon a defendant for the names and number of the negroes in his possession as administrator, an exception to the answer upon the ground that it does not give this information will be sustained.

A testator, by his will, made in 1825, desired his son to release an undivided interest in certain land which the son held in common with his sister, to the latter, " or, in lieu thereof," pay to his sister $5,000, and "with the payment of which, in case of his refusal or omission to release," as aforesaid, he " charged that portion of his estate" devised to his son.   The son accepted the devise, and died in 1837 without executing the release, and thereupon his sister became entitled both to the land charged, and that required to be released by the will; there was some evidence also that she enjoyed in the lifetime of her brother the beneficial use of the land to be released.   Upon a bill filed by the sister in 1846, to recover this sum of $5,000 from the general personal estate of her brother, it was HELD,—

1. That, under these circumstances, this claim is *strictissimi juris*, and should be made out in a very clear and satisfactory manner.

2. That the terms of the will are too clear and direct to leave any doubt upon the subject of the existence of the charge upon the land devised to the son.

3. That this charge was extinguished by the descent of the title to the land upon the sister, in whose favor the lien was created.

4. That by accepting the devise, the son became personally bound for the payment of the charge, if he refused or omitted to make the relinquishment required of him.

5. That though thus personally bound, the land devised was the primary fund for the payment of the charge, the personal responsibility being only

a collateral security, and the charge upon the land being destroyed by the union of the title and charge in the sister, she cannot have recourse to the personal estate of the brother to recover this charge.

The son became liable only in respect to the land devised to him, and even his personal contract to pay the money would not, in case of his death, shift the primary liability from the real to the personal estate.

Where land, subject to a mortgage or charge, descends to, or is purchased by a party, who dies, leaving the debt unpaid, the land is the primary fund for the payment of the debt, even though the purchaser covenanted to pay it, such covenant being regarded only as additional security.

The primary responsibility of the personal estate in general cases results from the fact that the contract is primarily a personal contract, the personal estate receiving the benefit, and hence the land is bound only in aid of the personalty.

The case of *Stevens* vs. *Gregg*, 10 *G. & J.*, 143, is not in conflict with this case; the controversy in that case was between pecuniary legatees and the devisee of the real estate, and the legacies were not charged upon the land.

The personal estate is the natural and primary fund for the payment of debts and legacies, even where they are charged upon the land devised or descended, and the real estate is only an auxiliary fund after the personalty is exhausted.

———

[The bill in this case was filed on the 21st of April, 1846, by Sarah E. Mitchell, who claimed to be a creditor of the estate of James D. Mitchell, deceased, by reason of the devise contained in the will of Francis J. Mitchell, quoted in the opinion of the Chancellor, and of the facts charged in the bill, all of which are fully stated in said opinion. The bill asks that the said claim of the complainant be paid out of the personal estate of the said James D. Mitchell. It also charges that the complainant is one of the distributees of said estate, calls upon the defendant to account in this Court for his administration thereof, proceeds to surcharge and falsify his administration accounts filed in the Orphans' Court in various particulars which are specified, and prays that he may be required to file and produce with his answer each and every voucher referred to in his said accounts. It avers that he had omitted to charge himself with the full hires and services of the negroes held and possessed by him as administrator *d. b. n.*, and with the full profits of certain leasehold property in the city of Baltimore, and prays discovery of the full and true

amounts so received by him, and also the number and names of the negroes in his possession as such administrator.

The answer, after denying that the complainant was a creditor of the said estate upon any account, and setting up various defences to her said claim, all of which sufficiently appear from the opinion of the Chancellor, as to such parts of the bill as are intended to impeach his administration accounts settled in the Orphans' Court, says, that the said accounts are in all respects, as he verily believes, just and true, and that he relies upon the same as true in all respects, and that if he shall be required, he will produce before the auditor of this Court all vouchers in his possession, and sustain the several allowances by such proof as may be required.

To this answer, the defendant filed seven exceptions, the character of which sufficiently appears in the following opinion of the Chancellor, delivered at the hearing thereof at July Term, 1847.]

THE CHANCELLOR :

This case comes now before the Court upon the order of the 12th of July last, passed upon the exceptions of the complainant to the defendant's answer; and arguments have been submitted by the solicitors of the parties. These, together with the pleadings and exceptions, have been read and considered.

Though, as in the case of *Owens* vs. *Collinson*, 3 *Gill & Johns.*, 25, an administrator may, when called upon to account to the Court of Chancery, exhibit with his answer, and explain not only the accounts passed in the Orphans' Court, but the vouchers for the credits therein allowed him, I am of opinion that it would be of pernicious tendency to compel him to do so. It might cause the pleadings to run into a degree of prolixity which would be extremely inconvenient. The accounts settled with the Orphans' Court are *prima facie* evidence in suits relating to matters contained in them, and he who disputes their correctness has the *onus* upon him. The vouchers, the Chancellor thinks, are to be regarded as evidence, and need not be filed as part of the pleadings. It must be

sufficient if they are produced before the Auditor when he is about to state the account. But to require them to be produced now, and explained in detail in the answer, would give rise to a practice which, in my opinion, would render Chancery proceedings intolerably expensive and voluminous. The answer offers to exhibit the vouchers before the auditor, and, indeed, without such an offer, their production would upon application be enforced. *Randall* vs. *Hodges*, 3 *Bland*, 477. I am of opinion, therefore, that the 1st, 2d, 3d, 4th, and 5th exceptions to the answer cannot be sustained.

But the 6th and 7th exceptions present a different question. The bill alleges that the defendant has omitted to *charge* himself with the hire, &c., of negroes, held and possessed by him as administrator, and with the full profits and rents of certain leasehold estates, and prays that he may be compelled in his answer to discover the full value and true amounts which he has received or ought to have received on account thereof. The answer does not give this information, and this is the ground of the 6th exception, which, I think, is well taken. The accounts passed in the Orphans' Court, with the light which the vouchers, when produced, will throw upon them, will not put the complainant in possession of the information called for by this charge in his bill.

The 7th exception is founded upon the omission of the defendant to state the number and value of the slaves which came to his possession as administrator *de bonis non*. One of the prayers of the bill, and it is a prayer warranted by an allegation, calls upon the defendant, in express terms, to state the number and names of the negroes in his possession. This has not been done, and this exception, therefore, is, I think, well taken, and will be sustained.

[After further answer and proof, and agreement of facts, all of which appear in the opinion below, the cause was submitted for final hearing, and argued upon notes by the solicitors of the respective parties. The Chancellor then delivered the following opinion at July Term, 1852.]

The Chancellor:

The late Francis J. Mitchell, who died in the month of March, 1825, by his will, dated on the 18th of that month and year, devised and bequeathed to his eldest son, James D. Mitchell, valuable real and personal estates, and the will, after making other dispositions, which do not appear to be material to the questions involved in this case, contains this clause:

"Whereas, my said son, James D. Mitchell, and my said daughter, Sarah E. Mitchell, are, in right of their late mother, who was the daughter of Dr. James Davidson, deceased, entitled as tenants in common to a portion or share of the real, personal, and mixed estate, of which he died seized or possessed. Now, it is my will and desire that my said son, James D. Mitchell, by deed duly executed and delivered, relinquish and release to the said Sarah E. Micthell his undivided interest in the same estate and property, or in lieu thereof pay to the said Sarah E. Mitchell the sum of five thousand dollars, lawful money, for and with the payment of which said sum of five thousand dollars, in case of his refusal or omission to relinquish and release as aforesaid, I do hereby charge that portion of my estate and property so devised and bequeathed to the said James D. Mitchell for his own use and benefit."

The bill alleges that James D. Mitchell accepted the devise and bequest to him, and that he omitted or refused to execute a release to his sister, the complainant, as required by the will of his father, and that there consequently devolved upon him a personal obligation to pay the five thousand dollars, which it seeks to recover from his personal representative. James D. Mitchell died in August, 1837, and upon a bill which was filed in the equity side of Charles County Court, in 1838, against his executrix, Elizabeth Mitchell, and which was afterwards amended by making his brother, Henry O. Mitchell, and his infant son, parties, it was decided that as the real estate, called "Myrtle Grove," which James D. Mitchell took under the will of his father, Francis J. Mitchell, and which was charged with the payment of the five thousand dollars, had descended to the complainant, the charge had become extinct by the union of

the title and lien in the same person.    The case was taken to
the Court of Appeals, and will be found reported in 2 *Gill*,
230.

The appellate Court, it would seem, do not express a posi-
tive opinion in reference to the existence of the charge in point
of law ; but the terms of the will of Francis J. Mitchell are too
explicit and direct to leave any doubt upon the subject, and it
is agreed on all hands that the charge did originally exist, and
that it is now extinguished by the descent of the title to the
property upon the complainant in whose favor the lien was
created.

The principal question presented in this case is, whether
the personal obligation upon James D. Mitchell to pay his
sister this sum of money, resulting from his acceptance of
the devise in his favor in his father's will, and his refusal or
neglect to execute the release required of him, (assuming that
he did refuse or neglect to do so,) is so far obligatory upon him
as to render his personal estate in the hands of his adminis-
trator liable, though the property charged with the payment
of it has devolved by law upon the party to whom the payment
was to be made ?

The plaintiff's case, as it appears to me, does not come very
strongly recommended to the favorable consideration of the
Court.    By the events which have occurred, she has become
the owner in fee of the property given by the will to James D.
Mitchell, and in respect of which this burden was imposed upon
him.    She has, also, by his death, if not before, become the
owner of the Davidson estate, the refusal or omission to relin-
quish which constitutes the ground of the personal claim
against him, and I am strongly inclined to think that there is
admissible evidence in the record of the former cause, and
which, by agreement, is made evidence here, as if taken under
a commission in this cause, that she did enjoy the benefit
of that property during his lifetime.    At all events, I think
it cannot be doubted that her brother always intended,
and even attempted, to comply with the directions of his
father's will in this regard, and consequently that he never

contemplated taking upon himself the alternative obligation of paying his sister the five thousand dollars. It is a case, then, in which the complainant has now, and has had, since 1837, when her brother died, an absolute title to the property charged with the payment of the money; in which she also had, and has had, since the same period, if not before, the property which her brother was required to surrender to her, and which, if so surrendered, the claim to the money could have had no existence, and of which, though there was no duly executed and delivered deed of relinquishment, there seems to me some evidence, at least, that she enjoyed the beneficial use in his lifetime. Under these circumstances, the claim to recover the five thousand dollars from the general personal estate from her brother is *strictissimi juris*, and should be made out in a very clear and satisfactory manner. I entertain no doubt whatever that by accepting the benefits conferred on him by his father's will, James D. Mitchell became personally bound for the payment of this money, if he refused or omitted to make the relinquishment required of him. If there could be any doubt upon the language of the will, the case of *West* vs. *Biscoe*, 6 *H. & J.*, 460, would remove it. But, although he became personally bound, the question still remains, he being dead, whether his own estate, or the estate devised to him, was primarily liable for the payment. I do not think this case can be distinguished in principle from that of *Mattheson* vs. *Hardwicke*, note to 2d *Peere Williams*, 664, the authority of which has received frequent and high approbation. In that case it will be found that a testator devised his estate to two persons, charged with the payment of debts and legacies. The devisees accepted the devise, and one of them paid all the debts and legacies, except one legacy of £100, for which he gave his note to the legatee, and died; but this note was held to be a mere collateral security, and that the devised estate was the primary fund for the payment of it. There could, of course, have been no doubt in that case that the devisee was, upon his note, personally responsible for the payment of the legacy. If the acceptance of the devise did not make him so, his note to

the legatee unquestionably did, and yet after his death the devised estate was regarded as the primary fund for the payment of it.  In reviewing that case and others of the same class, Chancellor Kent says, in *Cumberland* vs. *Codrington*, 3 *Johns. Ch. Rep.*, 229, " the question, in these cases, seems to be not only whether the purchaser has rendered himself liable at law to a suit by the creditors, but which estate is to be deemed the primary fund, and which only the auxiliary.  When a man gives a bond and mortgage for a debt of his own contracting, the mortgage is understood to be merely a collateral security for the personal obligation.  But, when a man purchases, or has devised to him land with an incumbrance on it, he becomes a debtor only in respect to the land, and if he promises to pay it, it is a promise rather on account of the land, which continues, notwithstanding, in many cases, the primary fund."  And the principle thus announced is illustrated by a reference to the cases in which it has been decided, that upon a transfer of a mortgaged estate, the party to whom the transfer is made will not render his personal estate liable in the first instance by adding his personal contract to pay the money, which was not originally his personal debt.  The rule being, as declared by Lord Eldon in *Waring* vs. *Ward*, 7 *Ves.*, 336, a very clear one, that the primary responsibility of the personal estate, in general cases, results from the fact that the contract primarily is a personal contract, the personal estate receiving the benefit, and being primarily a personal contract, the land is bound only in aid of the personal obligation to fulfil that personal contract.  The claim that this sum of five thousand dollars should be paid out of the personal estate of James D. Mitchell, in exoneration of the real estate descended to the complainant, can derive no support, as I think, from the case of *Stevens* vs. *Gregg*, 10 *G. & J.*, 143.  That was a controversy between pecuniary legatees and the devisee of the real estate, and it was decided, there being no clause in the will which, either by express terms or by plain inference, charged the real estate with the payment of legacies, that the land devised was not liable.  The legatee and the devisee, say the

Court, appear to have been equally the objects of the testator's bounty, and it does not appear to have been his intention to encumber his lands in the hands of his devisee with the payment of the legacies.

The question, in the case now under consideration, is a very different one.

Here, James D. Mitchell became indebted to his sister, the complainant, by accepting the devises in his favor in his father's will, and by omitting (if he did omit) to do that which his father said he should do, or pay his sister five thousand dollars, which sum he charged upon the property devised to his son. There was no primary responsibility on the part of the son to pay the money. He became a debtor, no doubt, by accepting the devises to him, and failing or refusing to do what was required of him (if such be the fact), but still he became a debtor only in respect to the property devised to him, and even his personal contract to pay the money will not make his personal estate liable in the first instance, in exoneration of the property in respect to which only he became the debtor. The case of *Mattheson* vs. *Hardwicke*, already referred to, is conclusive of the point, unless its authority can be shaken, which I do not find anywhere even attempted.

There can be no doubt, and the principle is not disputed, that the personal estate is the natural and primary fund for the payment of debts and legacies, even where they are charged upon the real estate descended or devised, and that the real is only an auxiliary fund after the personalty is exhausted. Such is the language of the Court of Appeals in *Stevens* vs. *Gregg*. But the question still recurs, whether, with regard to this debt, there was any original primary responsibility resting upon James D. Mitchell to pay it? whether the personal obligation does not result from the devise to him, and his acceptance of the devise, and whether he did not become liable only in respect to the land devised? If so, as we have seen, even his personal contract to pay the money would not, in the case of his death, shift the primary liability from the real to the personal estate. The assent of Mr. Chancellor Kent to the doc-

trine, that when a man purchases or has devised to him land with an incumbrance on it, he becomes a debtor only with respect to the land, and if he promises to pay it, is a promisor only on account of the land, which continues to be the primary fund, is very strongly expressed in the case of *Cumberland* vs. *Codrington*, as already cited. He says, "the doctrine, in such cases, is as firmly rooted and tenaciously adhered to as that which subjects the personal estate primarily, and as the 'natural fund' to the payment of debts' originally contracted by the party, and even though the debt should be contracted by mortgage without either bond or covenant." In a note to the case of *Butler* vs. *Butler*, 5 *Ves.*, 534, many of the cases upon this subject are collected, and the principle established by the case itself is expanded so as to embrace that now under consideration. The doctrine of *Butler and Butler* is that upon the purchase of an equity of redemption, the agreement of the purchaser with the vendor to pay the mortgage, without any communication with the mortgagee, is not sufficient to make it the personal debt of the purchaser; and the cases cited in the note show that though the purchaser may have rendered himself liable at law to the mortgagee or creditor, that will not be sufficient, in the case of the death of the purchaser, to shift the primary liability from the real to the personal estate.

This question came before the Supreme Court of the United States in the case of *M'Lean* vs. *M'Lellan*, 10 *Peters' S. C. Rep.*, 625, and after an examination of the cases, it was declared to be the well-established rule upon the subject that the burden of the debt was never transferred from the real to the personal estate, except when the contract is personal and the mortgage is given in aid of the personal contract. But that where the land descends upon or is purchased by a party, subject to a mortgage, and the purchaser dies, leaving the debt unpaid, it will be charged upon the land mortgaged as the primary fund, and the principle is not changed, though the purchaser covenants to pay the debt; the covenant, under such circumstances, being regarded as additional security. The views expressed by the Supreme Court, in the case re-

ferred to at pages 643 and 644, unequivocally maintain the doctrine, and it will be found fully sanctioned by Mr. Justice Story in his *Commentaries on Equity Jurisprudence*, vol. 1, sections 574, 575, and 576.

In vol. 2, of the same work, section 1248, where this subject is again discussed, the principle is reasserted that "where a person becomes entitled to an estate subject to a charge, and then covenants to pay it, the charge still remains primarily on the real estate; and' the covenant is only a collateral security, because the debt is not the original debt of the covenantor."

If this be the principle, and the real estate, which has descended to the complainant, be the primary fund for the payment of this claim, the personal responsibility of James D. Mitchell, resulting from his acceptance of the devise to him, being only a collateral security, I cannot see how it is possible to maintain this bill. The primary responsibility of the land is destroyed by the union of the title and the charge in the same person, and this being so, how can the party, in whose favor the charge was created, and who now holds the primary fund, have recourse to the collateral security? It is clear that if the land was held by a third person the owner of the charge would be thrown upon it, if it be the primary fund, or if the personal estate of the security was made to pay it, the personal representative would be entitled to reimbursement out of the land; and it is not seen how the rights of the parties can be different, or the secondary personal responsibility of James D. Mitchell converted into a primary liability by the circumstance that the land and the charge are united in the same person.

For these reasons, and upon this single ground, and without expressing any opinion upon the other questions which have been so fully and learnedly discussed at the bar, I shall dismiss the bill.

———

ROBERT J. BRENT, for Complainant.
WILLIAM SCHLEY, for Defendants.

———

[No appeal was taken in this case.]